**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**

**VERSUS**

**DEMETRICE LEONARD**

**CRIMINAL ACTION**

**NO. 16-114-JWD-EWD**

## RULING AND ORDER

This matter comes before the Court on *Defendant's Motion for Compassionate Release* (Doc. 106) filed by Demetrice Leonard ("Defendant"). The United States of America ("Government") opposes the motion (Doc. 117), and Defendant has filed a reply (Doc. 124). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, Defendant's motion is denied. Even if Defendant had shown she is no longer a danger to others or the community, the Court would exercise its discretion to deny compassionate release based on the factors set forth in 18 U.S.C. § 3553(a).

**I.     Introduction**

On May 21, 2018, Defendant pled guilty to theft of government money (Count 3) and aggravated identify theft (Count 9). (*Minute Entry from Re-Arraignment*, Doc. 47; *Judgment*, Doc. 95 at 1.) On January 24, 2019, undersigned sentenced Defendant to a term of 57 months on Count 3 and a term of 24 months on Count 9, to be served consecutively, for a total term of 81 months. (*Judgment*, Doc. 95 at 1–2.)

Defendant is currently housed at FCI Tallahassee in Florida. *See* The Bureau of Prisons ("BOP"), *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited December 8, 2020). Her projected release date is June 27, 2024. (*Id.*) To date, Defendant has served about 26 months in

prison. (*See Minute Entry from Pretrial Bond Revocation Hearing*, Doc. 70; Doc. 117 at 2, 19; Doc. 124 at 8.)

Defendant now moves for compassionate release. Specifically, she moves to "convert the balance of her 81 month sentence of imprisonment to supervised release with the special condition of home confinement." (Doc. 106 at 1.)

**II.     Discussion**

   **A.  Parties' Arguments**

   *1. Defendant's Original Motion (Doc. 106)*

Defendant's original motion focuses a great deal on her medical condition. Defendant explains how she has five pre-existing conditions (anemia, hypertension, obesity, a thyroid disorder, and pre-diabetes) that "put her at a serious risk for mortality" under CDC guidelines. (Doc. 106 at 5–8.) Defendant also explains that "her BOP recidivism risk level is minimum" and that she has taken a number of educational classes while in prison. (*Id.* at 8.)

Defendant then emphasizes how her facility in Tallahassee has been "hit hard by the pandemic," with reports of "eighty-eight confirmed cases of COVID-19 amongst the inmates and fifteen confirmed cases amongst the staff." (*Id.* at 9.) Defendant argues that she cannot properly socially distance and that BOP's efforts to protect inmates are insufficient. Defendant also urges that BOP reporting on case numbers is unreliable, as, for example, BOP only tests individuals with "significant symptoms." (*Id.* at 10.) Other BOP efforts are also inadequate, including efforts to sanitize common areas.

Defendant next explains her plans upon release. Specifically, Defendant seeks home confinement at her mother's residence, where she will assume care for her son and daughter. She

will work for Treyces Norris at Plush Body Magic, and her family will follow CDC guidelines and practice social distancing.

### *2. Government's Opposition (Doc. 117)*

The Government concedes that Defendant has exhausted her administrative remedies and that she has a condition (obesity) that qualifies as an "extraordinary and compelling" reason to reduce a sentence (though the Government disputes whether Defendant's other conditions qualify). (Doc. 117 at 1, 13–17.) The Government instead argues that the motion should be denied because (1) the defendant is a danger to the safety of any other person or the community under U.S.S.G. § 1B1.13(2), and (2) Defendant is "unable to show that the sentencing factors in 18 U.S.C. § 3553(a) warrant relief." (*Id.* at 2.)

As to danger, the Government asserts that "there is a significant risk [Defendant] would continue to steal from others if released." (Doc. 117 at 17.) The Government cites another case from Michigan involving a Defendant involved in a complex fraud scheme that reached the same results. (*Id.* at 17–18 (citing *United States v. Newton*, -- F. Supp. 3d -- , 2020 WL 4592891 at *4 (E.D. Mich. 2020).) The same reasoning applies here:

> Leonard was the leader of a sophisticated scheme to commit identity theft and defraud educational institutions and her criminal record and history suggest that she would commit more crime. She has defied numerous court orders and probationary restrictions, which shows a disrespect for the law.

(*Id.* at 18.) The Government also notes that, while Defendant "has a minimum risk recidivism level, has committed no disciplinary infractions while within BOP, and has been convicted of no other felonies save those that stemmed from this case," she benefited from dismissals in state court and engaged in recent criminal activity while on pre-trial release. (*Id.*) Defendant did not earn points for acceptance of responsibility at sentencing, and this reflects the fact that Defendant is not

3

"ready to turn the corner from the life of a criminal to that of a productive citizen." (*Id.* at 19.) In sum, Defendant remains a danger to the community.

The Government then argues that, for the same reasons, the § 3553(a) factors do not weigh in favor of release. "Leonard was the leader of a conspiracy that stole over $400,000 in terms of actual losses. . . . She stole the identities of 17 people without their knowledge. . . . She caused a lot of damage." (Doc. 117 at 19.) A sentence of 26 months would, according to the Government, be "too lenient, even in light of the pandemic." (*Id.* at 19–20.) The Government also states that, in the past, when this Court has granted a motion for compassionate release, the Court has reduced the sentence to time served and added as an additional condition that the Defendant be placed on home confinement until his original release date, followed by the original term of supervised release. Given the facts in this case, the Government maintains that this type of long period of supervised release would "disserve the interests of the community and would not be an effective use of the limited resources of our United States Probation Officers." (*Id.* at 20.)

Additionally, Defendant's "release plan is hardly ideal." (*Id.* at 21.) The Government highlights how she has an active arrest warrant in the 19th JDC for a misdemeanor which could put her back into custody and thus in further danger of contracting COVID-19. Further, her "release plan is somewhat vague," as there is no affidavit of, *inter alia*, what her duties will be at her proposed job and whether the employer knows of her criminal history. (*Id.*) Lastly, Defendant failed to provide details about her home situation so that the Court can analyze whether she faces a greater threat of exposure if released than in BOP custody.

### *3. Defendant's Reply (Doc. 124)*

After discussing her health condition and responding to the Government's arguments regarding same, Defendant then argues that she would be safer at home than at FCI Tallahassee.

4

Defendant asserts that many courts have recognized that individuals in jails and prisons are at a greater risk of contracting COVID-19 than in the community. Moreover, BOP is not adequately managing the pandemic, "in part through no fault of its own and in part through inadequate planning and testing." (Doc. 124 at 4–5.) As to the latter, Defendant complains about the failure to test inmates and guards entering the facility on a regular basis. Defendant also objects to the failure to address "presymptomatic or asymptomatic spread of COVID-19 among staffers, contractors, and inmates." (*Id.* at 5.) Defendant further objects to the failure to provide and use adequate PPE and to sanitize the facility. Defendant also distinguishes *United States v. Stanley*, No. 98-106, 2020 WL 6060877, at *5 (M.D. La. Oct. 14, 2020) (deGravelles, J.) on the grounds that (1) the instant case involves a different facility with a higher number of COVID cases; and (2) Stanley faced a life sentence for a violent crime and had dozens of infractions in jail, whereas Ms. Leonard was in jail for a non-violent crime, was not serving a life sentence, and had demonstrated post-sentence rehabilitation. Lastly, an August CDC report demonstrated that mass testing in prisons showed a 12-fold increase over the number of cases identified through symptoms alone and three times as many cases in dorm-based housing (like Ms. Leonard's) than cell-based.

Defendant next argues that she is not a danger to the community. She has no prior jail time before and has now been incarcerated twenty-six months. "This term of incarceration has had a specific, deterrent effect on Ms. Leonard." (*Id.* at 8.) Additionally, she has a minimum recidivism risk level (the lowest in the BOP) and has no other felony convictions. The Government cannot speculate as to why the other felony charges were dismissed, and, in any event, Defendant has shown rehabilitation through her "following orders, committing no disciplinary infractions while in custody, and completing numerous educational classes to help her transition back into the community." (*Id.* at 8–9.)

As to the § 3553(a) factors, Defendant may have stolen $400,000, but she did not "receive[] the lion's share of the proceeds" and got only $13,581.63 for her role in the conspiracy. (*Id.* at 9.) Defendant asserts:

> While Ms. Leonard concedes this is a serious offense, this Court did not sentence Ms. Leonard to death or threat of confinement under serious illness. Ms. Leonard's conduct does not justify exposing her to that level of risk.

(Doc. 124 at 9.) The need for deterrence does not "outweigh [Defendant's] ability to survive in jail given her medical conditions." (*Id.*) Additionally, the outstanding warrant is no hindrance to release, as Defendant has been assured that she can surrender herself, be processed, and post a small bail so that she will only be in jail long enough for her mother to post bond.

As to Defendant's release plan, her mother is an anesthesia technician at Our Lady of the Lake Hospital in Baton Rouge, and her son attends Zachary High School virtually. Additionally, Defendant's potential employer is aware of her criminal history and is willing to hire her. Her minor daughter will go into daycare. Defendant further distinguishes *Stanley*'s finding that that defendant faced an even greater threat outside the home because (1) the Court should evaluate these matters on a case by case basis; (2) it would be an "impossible standard" for Defendant to meet if the Court were to reach this decision in all cases involving individuals working outside the home with children in school; and (3) she is "more likely to have a more favorable outcome were she to contract COVID-19 out of custody," as she could be tested when she chose and could go to the hospital if symptomatic. (Doc. 124 at 11.)

Defendant finishes:

> In conclusion, Ms. Leonard's undisputed "extraordinary and compelling" circumstances, pre-existing conditions and the COVID-19 pandemic, and her postsentence rehabilitative conduct, outweigh the serious nature of this offense and militate in favor of granting this motion. Ms. Leonard is not asking for a "get out of jail free" card, Ms. Leonard is asking for relief that Congress has authorized this

6

Court to grant under these circumstances in addition to the "wide latitude" the Second Circuit has given the Court in *Zullo*.

(Doc. 124 at 12.)

### B. Applicable Law

The compassionate release statute now provides:

**(c) Modification of an imposed term of imprisonment.**--The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case--

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), *after considering the factors set forth in section 3553(a) to the extent that they are applicable*, if it finds that--

(i) extraordinary and compelling reasons warrant such a reduction; . . .

and *that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*; and

18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added). Here, again, the Government concedes that Defendant exhausted her administrative remedies and that she has at least one condition that constitutes an extraordinary and compelling reason for release. (Doc. 117 at 1.)

Under 28 U.S.C. § 994(t), "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." "Accordingly, the relevant policy

7

statement of the Commission is binding on the Court." *United States v. Clark*, 451 F. Supp. 3d 651, 655 (M.D. La. 2020) (citing *Dillon v. United States*, 560 U.S. 817, 827 (2010)).

U.S.S.G. § 1B1.13 contains the relevant policy statement. *Id.* This section provides:

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, *after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable*, the court determines that--

> (1)   (A) Extraordinary and compelling reasons warrant the reduction; or (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2) *The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)*; and
>
> (3) The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13 (emphasis added).

18 U.S.C. § 3142(g) provides:

(g) **Factors to be considered**.--The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning--

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug

8

>> or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

Finally, the § 3553(a) factors include, inter alia, "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] (B) to afford adequate deterrence to criminal conduct[.]" 18 U.S.C. § 3553(a)(1), (2).

"Generally, the defendant has the burden to show circumstances meeting the test for compassionate release." *Clark*, 451 F. Supp. 3d at 656 (citing *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019)). Ultimately, however, "compassionate release is discretionary, not mandatory, and could be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).

### C. Analysis

Having carefully considered the matter, the Court will deny Defendant's motion. The Court finds that, even assuming Defendant is no longer a danger to the community, her motion fails for two reasons.

First, Defendant has failed to show that BOP's measures for dealing with COVID-19 are inadequate. The Government cites the extensive measures BOP has taken to combat the pandemic, including temperature checks, the use of PPE, and cleaning efforts. *See* BOP, *Information Sheet, Correcting Myths and Misinformation About BOP and COVID-19,*

9

https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf (May 6, 2020); *see also Stanley*, 2020 WL 6060877, at *5 (detailing BOP's measures, including securing inmates in their quarters, quarantining/isolating new inmates, suspending inmate movements, social distancing, and issuing and using PPE); *Opposition*, Doc. 117 at 11 (representing that measures described in *Stanley* are also used at FCI Tallahassee). Defendant is essentially complaining that the conditions at FCI Tallahassee are not perfect. For instance, Defendant attacks BOP's COVID-19 numbers because there is no universal testing. But perfection is simply not possible in the world of the pandemic,[1] and it is certainly not required. All of BOP's efforts, cited above, are eminently reasonable under the circumstances.

Further, BOP's efforts are working. As of December 9, 2020, there are only four confirmed active cases of COVID-19 among inmates and 13 among staff at FCI Tallahassee, all in a facility with 806 total prisoners. *See* BOP, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last visited Dec. 10, 2020); BOP, *FCI Tallahassee*, https://www.bop.gov/locations/institutions/tal/ (last visited Dec. 10, 2020). This shows a steep decline in the number of inmate cases since Defendant filed her motion on October 20, 2020. (*See* Doc. 106 at 9 & n.8 (citing 88 confirmed cases among inmates and 15 cases among staff).) Indeed, these most-recent numbers demonstrate that, despite earlier problems, BOP is managing COVID-19 well at FCI Tallahassee.

Lastly, as one appellate court said in the context of the exhaustion requirement:

We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like [Defendant]. But the mere existence of

---

[1] Even Defendant's plan for release is not ideal. Defendant intends to live with her mother, a health care provider at a hospital, where (even as an anesthesia technician) she will presumably be exposed to others at work, in grocery stores or pharmacies, and in the community. (Def. Ex. A, Doc. 124-1.) Further, Defendant herself desires to work after release; while her employer represents that it complies with CDC guidelines, Defendant will still face exposure to many in the public. (Def. Ex. B, Doc. 124-2.) In any event, the employer uses some of the same protections (masks and temperature checks) as BOP. (*See id.;* BOP, *Information Sheet, Correcting Myths . . ., supra.*)

> COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.

*United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The same reasoning applies here. Defendant's condition may be serious, but that alone does not justify compassionate release, particularly given BOP's "extensive and professional efforts to curtail the virus's spread." *Id.* In sum, "Defendant has failed to show that the BOP's measures for dealing with COVID-19 are inadequate," and, on this ground alone, Defendant's motion could be denied. *Stanley*, 2020 WL 6060877, at *5 (citing *Clark*, 451 F. Supp. 3d at 657 ("there is no evidence before the Court that the BOP's plan to address the pandemic will not adequately protect inmates"); *United States v. Alexander*, No. 14-126, 2020 WL 2468773, at *8 (M.D. La. May 13, 2020) (deGravelles, J.) (denying motion for compassionate relief in part because "Petitioner has failed to demonstrate that the BOP's measures for dealing with COVID-19 are inadequate.")).

Second, even if the BOP measures were inadequate, the Court would deny Defendant's motion because the § 3553(a) factors weigh against release. While the Court has considered all of the relevant factors and the totality of the circumstances, the Court finds most relevant (1) the history and characteristics of the defendant; (2) the nature and circumstances of the offense; and (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence.

As to the first, though the Court has taken into account the facts about Defendant she highlights (particularly her medical condition, her efforts at rehabilitation since incarceration, her Minimum Risk of Recidivism Level, and her not having any disciplinary record in prison), other facts weigh against release. Defendant still had a criminal history category of II which included one juvenile adjudication and four adult convictions. (*Revised PSR* ¶¶ 50–56, Doc. 62.) The

11

defendant's adult convictions are for simple criminal damage to property, stalking (which involved the violation of a protective order), improper equipment, and attempted theft of goods (involving shoplifting a Chi flat iron and Cobra radar detector at a Target). (*Id.*)

Perhaps most troubling is Defendant's conduct while on pretrial supervision. The Revised PSR explains how Defendant lost her acceptance of responsibility points:

> While under pretrial supervision the defendant was issued a misdemeanor summons for theft of goods on December 9, 2017. The defendant failed to report this law enforcement contact to her pretrial officer. On May 26, 2018, an arrest warrant was issued for the defendant for theft and access device application fraud. This conduct occurred after the defendant pled guilty to the instant federal offense.

(*Id.* ¶ 34.) The December 9, 2017, summons involved the theft of clothing from Macy's. (*Id.* ¶¶ 62, 7.) The May 26, 2018 arrest warrant involved Defendant stealing from her employer (Sally's Beauty Supply) by making fraudulent refunds under false customer names and phone numbers for items not returned to the store and by taking the refunded cash. (*Id.* ¶¶ 63, 74.) Defendant was terminated after Sally's discovered her theft. (*Id.* ¶ 74.)

Defendant's bond was ultimately revoked (1) because she was alleged to have engaged in criminal conduct while on release (highlighted above); (2) because she was aware her pretrial services officer was looking for her but she failed to stay in contact with her officer; and (3) when law enforcement officers were ultimately able to locate defendant, after expending significant man hours to do so because she was not residing at the address she had provided to pretrial services, the defendant failed to surrender to law enforcement, which required law enforcement to enter the home by force with her 14-year-old son present. (*Minute Entry from Revocation Hearing*, Doc. 76.) All of this conduct reflects a lack of respect for the community, the law, and the court system.

In sum, even taking into account Defendant's rehabilitation, recidivism level, clean disciplinary record, and health conditions, a mere twenty-six months of good behavior does not

entitle her to release, even amid the COVID-19 pandemic. *See Alexander*, 2020 WL 2468773, at *8 (rejecting request for compassionate release in part because, though the defendant was a "relatively young man who represents as having a low security score and having engaged in considerable rehabilitative efforts, . . . his age puts him outside the high risk groups over 70 who are particularly susceptible to COVID-19.").

Additionally, the nature and circumstances of the offense also weighs against release. Defendant pled guilty to theft of government money (Counts 3) and aggravated identify theft (Count 9). (*Judgment*, Doc. 95 at 1.) The *Revised PSR* details how Defendant defrauded the U.S. Department of Education's federal student assistance programs. (*Revised PSR* ¶¶ 8–28, Doc. 62.) Specifically, Defendant used the names, Social Security numbers, and dates of birth of unknowing third persons to submit fraudulent applications to enroll in online classes at certain universities. (*Id.* ¶ 21.) Defendant chose the schools and classes which were fraudulently enrolled into and submitted fraudulent applications in the names of unknowing third parties. (*Id.*) Defendant knew these third persons were unaware of their enrollment in the classes and would not maintain satisfactory progress in or complete the classes. (*Id.*) She also submitted applications to enroll herself and her co-conspirators in online classes at these universities knowing same. (*Id.*) After the applications were submitted, Defendant submitted FAFSA forms in which she falsely certified that the federal student financial aid would only be used to pay the costs for attending the institutions of higher learning for the seven unknowing third persons, herself, and her co-conspirators. (*Id.* ¶ 22.)

Defendant and her co-conspirators also recruited a number of "straw students" who agreed to let Defendant use their personal information to register for online classes and to be used on FAFSA forms with the false certification. (*Id.* ¶ 23.) These "straw students" then received a cut

of the money gained (*Id.*) Defendant and the other conspirators were able to keep most of the money obtained using their names. (*Id.*)

The *Revised PSR* also lists the names of seventeen individuals whose personal information was stolen and used by Defendant and her co-conspirators without the victims' knowledge and consent. (*Id.* ¶ 27.)

From all of this conduct, Defendant and others fraudulently received student federal financial aid payments. (*Id.* ¶ 25.) The intended loss to the U.S. Department of Education was $614,435.00, and that department actually disbursed $406,145.92 in student federal aid as a result of the defendant's fraudulent applications. (*Id.* ¶ 28.) Thus, while Defendant downplays the offense by saying she only profited $13,581.63 for her role in the conspiracy (Doc. 124 at 9), the losses to the government (intended and actual) were substantial.

The severity of the crime is also highlighted by the guideline calculations. Defendant received a 14-level enhancement because the intended loss amount was greater than $550,000. (*Id.* ¶ 37.) Because the offense involved two or more victims (in fact, seventeen), she received an additional two levels. (*Id.* ¶ 38.) The offense involved sophisticated means (here, "straw students," three universities in three states outside Defendant's community, and sixteen bank accounts), so there were an additional two levels. (*Id.* ¶ 39.) Finally, Defendant was a "leader in this fraudulent scheme which involved at least fifteen participants," so she received an additional four levels. (*Id.* ¶ 41.) The original offense level was 28. (*Id.* ¶ 84.)

Her total offense level was later reduced to 23, resulting in a guidelines range of 51—63 months, plus a consecutive 24 months (for a total of 75—87 months). (*Statement of Reasons*, Doc. 96 at 1—2.) This Court imposed a total prison sentence of 81 months. (*Judgment*, Doc. 95 at 2).

In sum, the nature and circumstances of the offense weigh against release. Defendant's sophisticated scheme, of which she was a leader, involved a number of players, many victims, and substantial losses to the Government.

Finally, "[t]he Court also finds that the sentence imposed should reflect the seriousness of the offense and afford adequate deterrence; this is the reason why the Court gave [Defendant] the sentence it did" (here, a mid-guideline sentence), "and the Court believes that giving the [Defendant] compassionate relief would undermine those goals." *Alexander*, 2020 WL 2468773, at *8; *see also Stanley*, 2020 WL 6060877, at *6 (quoting *Alexander*). This is particularly true considering that Defendant has served only about 26 months of an 81-month sentence. This is about 32%—about a third—for a serious financial crime. Releasing Defendant at this point would fail to provide just punishment for the offense. *See Stanley*, 2020 WL 6060877, at *6 (citing this reason even though Defendant had "served about twenty-three years of a life sentence for an extremely serious crime" (citing *Chambliss*, 948 F.3d at 694 (noting that the district court considered these factors under § 3553(a) in denying a motion for compassionate release and finding that the lower court did not abuse its discretion)).

### III.  Conclusion

In sum, the Court finds that, even if Defendant had shown that she is no longer a danger, the Court would still exercise its discretion to decline the motion. Accordingly,

**IT IS ORDERED** that *Defendant's Motion for Compassionate Release* (Doc. 106) filed by Demetrice Leonard is **DENIED**.

Signed in Baton Rouge, Louisiana, on December 11, 2020.

_____
**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**